Good afternoon. We have one case for argument today, which is New Hope Family Services, Incorporated v. Poole. We'll hear from counsel. Your Honor, it's Roger Brooks with Alliance Defending Freedom for New Hope Family Services. There are currently 20,000 children in foster care in the State of New York, of whom 4,000 at any given time are qualified and waiting for adoption, and less than half of those will, in fact, be adopted within a year. It's an overstretched system. Faith-based agencies make an outsized contribution to meeting that crisis, and... Why is that? Is that because there are not enough agencies or not enough people who want... Your Honor, I think they're a waiting list to adopt as well, so the answer is, this is not in the allegations of the complaint. I believe the answer is that it's really the nexus, it's the agencies, it's the resources made available by the State and by private services. And the faith-based agencies are disproportionately helpful because they have their ability to reach into faith communities, which have a demonstrated disproportionate willingness to adopt hard-to-adopt children, such as those with disabilities and those born with addiction, which is a very large problem in today's world. I don't understand your adversary to be disputing, at least at this time, that your placements are done responsibly. They just want you to expand the pool of applicants that you will consider. So why don't you tell us? I mean, I think you can assume we know some of what you've been emphasizing now. What is your constitutional claim here that you say survives the motion to dismiss? Your Honor, of course, a motion to dismiss is inherently complex. I'd like to emphasize two things. As to free speech, I would say the mask is off. In briefing to this court, the State has now made very clear that it intends and expects the regulation to compel and censor New Hope's speech. I think that claim survives, and indeed, a preliminary injunction should be entered on the basis of the free speech claim. Well, I expect they're going to dispute that they're compelling speech, so why don't you tell us why you've got a colorable claim that they are? Yes, Your Honor. In our complaint, we alleged New Hope's beliefs about what's faith teachings about marriage and the best interest of children, and further alleged that New Hope does and wants to teach that message to both birth mothers that it works with and adoptive couples that it works with. Now, the district court found that OCFS and the regulation, quote, simply do not compel speech. That was failing to accept the allegations. But more dramatically, that finding by the court has since been repudiated by the State in the briefings to this court. I would call Your Honor's attention to the State's brief filed in opposition to our emergency motion for interim relief, which is ECF number 101, and there they said the regulation does not, quote, restrict New Hope's speech unrelated to its provision of adoption services. And they said the regulation that New Hope is, quote, not precluded from espousing its beliefs about marriage and family outside the contours of its adoption program. Well, that's fairly plain English. And what they're saying there is what we alleged. That is, the inescapable effect of the regulation is to constrain and to compel New Hope's speech as it deals with birth mothers, as it deals with adoptive couples. It says, no, you can't speak about or advocate your Christian beliefs about marriage and the best family for children to adoptive parents and birth parents, even though they chose to come to you as a very clearly identified Christian ministry. So there's really no more denial of the intent to change what New Hope can say in the midst of what is its reason for existence. How do they try to excuse that? They also don't really, the State doesn't really defend the district court's finding that all of New Hope's speech has been expropriated and is now governmental speech. Instead, they argue that it's okay to censor and compel, because this is speech merely incidental to conduct, and they rely heavily on the Rumsfeld v. Fair case. I claim that case. Sotomayor's certificate of authorization, which I understand predates this regulation by many years, nevertheless says that you will function in complete cooperation with all existing social welfare agencies. Once the welfare agency defines the pool of people who are qualified to adopt, what are you claiming is the right you have to not cooperate on that point? Well, of course, Your Honor, a general obligation to cooperate can't be leveraged to accomplish unconstitutional ends. We're claiming that we can't, we're claiming that my client can't be compelled to bring into the discussion that it has, it has group meetings, it has prayers, that it can't be compelled to engage in discussions that seem to approve same-sex or unmarried couples as consistent with the best interests of children. It can't be compelled to present those as recommended parents to birth mothers who come to it and entrust their child to it for placement. Given the State policy, though, can you be compelled to refer? I know you say you do refer, but can you be compelled to refer so that if a gay or unmarried couple comes knocking at your door rather than closing it, you have to refer them? Your Honor, that may present hard questions, and I haven't thought about it because my client has been happy to do so. So whether that might be unconstitutional to require one to refer, I think there have been cases that have arisen in the abortion context that suggest that requiring one to refer, and certainly there have been cases that say that requiring one to post-referral information is an unconstitutional compulsion. So I think that's up there. Sotomayor, let me ask you that apropos of this particular case, because if we were to agree with you and to vacate the dismissal, you want us also to grant you a preliminary injunction, is that right? That is right, Your Honor. Now, that preliminary injunction, by contrast to the one we have entered, would allow you to continue to pursue new applicants, am I right, the injunction you want on remand? The injunction that we want on remand, Your Honor, is exactly as the previous injunction minus paragraph 2, which restricts my client's ability to take new applicants, because otherwise it will kill them. So if we were to agree to that, and I'm not saying we would, would you also agree to commit yourselves to referrals of any gay or unmarried couples who sought to adopt with you in the interim? Yes, Your Honor. Okay. I would like, in the short time available, to point out one other thing, that is that the State has admitted that facts alleged by New Hope plausibly allege animus. We alleged various facts and statements that I can't recite. I'd like to call the Court's attention to the State's brief at page 43 and 44, when they said of those facts that we alleged, they referred to them as, quote, arguably ambiguous and susceptible of different interpretations. I'll take that. If it's arguably ambiguous, then that means that for purposes of motion to dismiss, it's necessary to draw the inference in favor of my client. Thank you, Your Honor. I have reserved. You have indeed, but we can go on with some questions. Yes. You can feel more at ease. Let me just ask you a few things so I understand your argument. Religious organizations, they're not excused from complying with valid and neutral laws, right? Well, Your Honor, we have pointed out that there is precedent that suggests that if even a valid and neutral law reaches right into the heart of faith and disrupts that, that perhaps the answer is no. And we've referred to the Hosanna-Tabor case. We've referred to the dictum in, I believe, Masterpiece Cakeshop, saying, well, of course the State couldn't require a faith, a religious organization, a church to perform a same-sex wedding, even though you can readily imagine a facially neutral law that says everybody who is authorized to perform legally valid weddings must perform all legally permitted weddings. So I think the answer is not necessarily, but we're also happy to, we also believe that we've alleged facts and indeed put in facts that meet the requirements of Smith. Is that, is there a distinction, though, between something such as the marriage ceremony, which is viewed as a sacrament by the faith, and adoption, which is certainly a charitable function that you tie back historically to faith organizations, but is not a required sacrament or ritual of the faith? Is there a difference there? Well, I certainly don't think that the law can turn on what one church or another or faith or another calls a sacrament. Catholics consider marriage a sacrament. Protestants don't. No, no, but I mean, you understand my point here. You're not suggesting that New Hope views this as a religious ritual that is part of its, part of its expression of faith, or do I misunderstand? I would say that it is, New Hope views it as more important than a religious ritual. That is, that the forming of a family, that the placing of a child into family, that the formation of the next generation is frankly central to any major faith system. It is at the very core in, you can kind of go through them and say, well, New Hope believes that a religious ritual is considered a sacrament, not because it's a religious ritual, but because it's forming a family. And by placing children into family, New Hope does believe that it's engaging something of the utmost human and religious importance. It can only be done pursuant to the laws of the State, as the New York Court of Appeals explained it didn't even exist at common law, so it's only a matter of State law. That, that, that suggests it operates separate and it's a religion that seeks to foster it. Well, adoption as, adoption as a legal thing and adoption as a human thing, I suppose, are not the same. Adoption has existed since time ancient. And, and faith-based organizations have been taking in families and placing them in homes since time ancient, and I expect to put an expert testimony about that very issue at trial. But the bottom line, I would say, is that when you look at Hosanna-Tabor, when you look at the discussion about performing marriages, what those have in common, and what other similar cases have in common, is they're about this thing at the heart of human existence, which is family and the, and the formation of the next generation. And that is sacred and protected, we believe, is kind of what the Court is groping at. I do not claim that that is a well-developed area of law or crisply defined. Robert Brooks, let me ask you a question or two. Is there any indication that at the time that the regulation was adopted, the OCFS had any specific hostility toward religion? I think the, the contemporaneous evidence, Your Honor, and these things unfold fairly quickly, was I think we've cited a public statement that's, in which they've said there's no place in New York for any agency that doesn't comply. We've, we've been referring to this type of belief as archaic. They referred to the regulations as archaic. The regulations archaic because they embody exactly this belief, which, as you well know, was the legal requirement until not so long ago. So I think, I think that, and then follow up in fairly rapid succession by the statement of the enforcing officer who says, other Christian organizations have decided to compromise and stay open. Well, what does that tell you? It tells you somebody's keeping track. They know who this is affecting. They know what the results are keeping an eye on it. They know what they're trying to achieve. Let me ask you, Mr. Brooks, perhaps if you can recapitulate for us the timeline of proceedings in the district court, because I'd like to know how much you've done in the district court, and also ultimately what I'd like to ask you to do is focus on the, the applicable legal standards for preliminary injunctive relief. So why don't you tell me exactly what took place in the district court? What took place in the district court, Your Honor, was submission of the complaint, submission of a preliminary injunction motion with attached affidavits, responsive affidavits, which I think, as we pointed out in the brief, say what they say, but don't in fact contradict key facts. So the facts are as alleged for that purpose. And then an oral argument, that is, there was no evidentiary hearing. There were no witnesses on the stand. Is there a request for an evidentiary hearing? There was not a request for an evidentiary hearing, Your Honor. That's what you seek in any kind of decreed language that we may issue. What is it that you want? Let's look at it that way. What do we want? What we would, what we want is remand to proceed into discovery. I think many of these issues would benefit. Vacate the dismissal. Vacate dismissal, grant a preliminary, instruct the court to enter a preliminary injunction while we proceed with full-scale litigation is what we want. And on your point, I should emphasize that what New Hope was happy to agree to as an interim measure just pending this appeal, that is, we will remove the issue of discrimination with applicants by taking no applicants. If that's left in place throughout a discovery and trial period, it will kill New Hope by strangulation as surely as the effort by OCFS a few weeks ago would have done. What would you be looking for in discovery? What would be, we would be probing exactly the question of who has this been enforced in. We have limited visibility and we see that right in this time period that New Hope is being threatened, that a number of faith-based organizations disappear off the list of approved organizations. Well, needless to say, we'd like to see internal documentation that goes both to actually the formation of this. What's the proximate cause? Why did they feel the need for this? I think I know the answer, but I haven't had discovery. And then is enforcement targeted? Are they out there doing what they did to New Hope, to faith-based agencies, saying, you know what? Everything's good here and it's all in good order, but we need to see your policies. And that's what happens in New Hope. So we would be looking for evidence of targeting both in its origin and in its enforcement. I think also any allegation that this policy is furthering, is actually furthering any compelling interest, something that would need to be showed under strict scrutiny, is going to be very difficult for the government to prove, and we intend to establish facts that will disprove furthering. We'll turn to the standards for injunctive relief. There may be agreement, and we'll ask the government and the state to comment on this. The first prong is irreparable harm. In your view, that's been settled? In my view, that's settled as a matter of law. That is, if it's likely that there's a violation of First Amendment rights, that just is irreparable harm. And frankly, I think the uncontradicted facts, the fact of closure of New Hope, seeing that as irreparable harm is not difficult, but it's also not necessary because the law is so clear that any deprivation of First Amendment rights, even on a temporary basis, is irreparable harm. What else do you need to show us here or the district court on remand in order to secure preliminary injunctive relief? The answer, Your Honor, is simply likelihood of success on any one of the claims, any one of the First Amendment claims, period. But that standard is particularly difficult to meet when a party is seeking an injunction against a government. Your Honor, I think that rule kicks in when you're talking about balancing of harms, but in the First Amendment area, I believe it doesn't. I think the law is clear that if I can show, if I can convince you that we have a probability of success, then it follows necessarily that there's irreparable harm as a matter of law, and we're done with the preliminary injunction analysis. The difference between your demonstration of premature dismissal and likelihood of success, though, seems to be something we have to consider. I mean, you've argued that there's ambiguity as to why they passed the regulation and that that should entitle you to discovery. Even if we were persuaded of that, ambiguity doesn't necessarily get you to likelihood of success. How do you satisfy the likelihood of success? Let me tell you what I think are the two strongest points on that. One, in light of the facts alleged and now, frankly, admitted by the State with regard to speech, compulsion of speech in these interactions, I think that you should find a likelihood of success. They say the result of this regulation is we're free to say whatever we want outside the scope of the ministry. That's a major issue. I want to understand your freedom of speech argument. I mean, you don't conduct your traditional evaluation, because it would be a waste of time, given what your bottom line policy is. So what speech are they preventing you from engaging in? I just want to understand that. I think the point is, if New Hope is required to bring those people into the counseling conference room, then New Hope would be compelled to have any sort of good faith counseling of them to be prepared to be adoptive parents, when New Hope believes that they can't be best interest of the child adoptive parents. Puts New Hope in an impossible situation, which is why the State's exactly right that if this is compelled, then New Hope is left free to say what it really thinks only outside the scope of the ministry. And if New Hope is compelled to do home studies for these folks and evaluate them, and as OCF clearly intends, to recommend these couples to the birth mothers who come to them and say, help me select a home for my child, then that recommendation is contrary to what New Hope believes to be true, according to the teachings of its faith. It believes that cannot be in the best interest of the child. So it's really the compelled speech. There's obviously, if you bring somebody into your group discussion with other parents who violently disagrees with your faith principles, that puts a damper on the conversation. That kind of brings us into some of these associative communication cases and concerns about changing my message. But when it comes to the birth mothers and counseling the specific couple, it really requires New Hope to say things that they believe that their faith teaches them as false and ought not to be said. In the end, doesn't the regulation really require you to be open to the idea that you would say that it is in the best interest of a child to be adopted by an unmarried couple, by a gay couple, and that that is what you absolutely cannot say, according to your brief, consistent with your faith? Is that right? Your Honor, that is exactly right. So you're arguing that it starts with the first counseling session, but to be in good faith compliance with this regulation, you have to, in the end, be prepared to say that it's in the best interest of a child to be adopted by an unmarried or by a gay couple. Correct. New Hope speaks in three directions in this relationship. One is to the would-be adoptive parents, another is to the birth mother, and each of these generally pick New Hope because it's a faith-based ministry, one of a few out of many secular and state agencies. And third, it speaks to the state in a final report in which it must, it can only certify if it believes that this placement is in the best interest of the child. And again, it's obviously intended that New Hope not discriminate in that, even though its faith teaches it that in no case is that in the best interest of the child. So that's, they're not stopping, they will refer, they're not, there's no allegation that anybody has been prevented or even discouraged from adopting. But they say we can't devote our resources, and they're all private resources, not a dime of state money involved in this, that we can't devote our energies and our resources to placements and all those relationships of speech that we believe are wrong. The state would preclude you, in your view, from asking a parent who says they prefer a child. Catholic parents to be placed with a Catholic family, would you be permitted to ask the birth mother whether she would want a placement with a married heterosexual couple? Forget about persuading, just... The regulation doesn't say anything about that, Your Honor, so I don't know the answer to that. But the regulation does talk about deference to the wishes of the religious wishes. It does with the religious wishes, and indeed the state, this takes me to the second point where I, to answer both your questions at once, I hope. Yours is, on what grounds do I think my client's entitled to preliminary injunction? And yours takes us into the area of general applicability and what exceptions are permitted and not permitted. And this is an area where I think also, and it's so fact-intensive and detailed that I can't begin to recite it all in argument and as a matter of fact, it's better done in writing anyway, and you have that. What I would say is that the different treatment of my client's beliefs here is exactly highlights the problem. That is, we begin with a regulation that purports to outlaw discrimination on the basis of a whole long list of protected characteristics and morbicides, and then you start shooting holes in it with exceptions. And there are many exceptions. There are exceptions permitted or required when it comes to going out and recruiting parents, who gets to the front of the line, who gets to the back. There are exceptions allowed even on the basis of race, the most troubling category in our nation's history and our constitutional law. There are exceptions for that. There are exceptions for ethnicity, for religion. You're required to take the religion of the child into account. You're required to place the child, the religion of the child's origin, into account. You're required to place the child with a family of the same religion, so long as that's not inconsistent with the best interest of the child. All these substantial exceptions to things that in other contexts we would consider to be unacceptable discrimination based on those categories. The only category that OCFS says, oh, we could never consider, we could never contemplate, I think was their word, on the basis of race, an exception on that basis, is the one belief which OCF knows and has said is primarily in today's world, in this state, associated with religious faith. And that is the belief in what many people would describe as an old-fashioned, and they would describe as a traditional and biblical view of marriage and the form of family in the best interest of the child. Now, go ahead. Do you in any way challenge before this court the authority of the agency to shut you down, or to have promulgated this particular regulation, given the language of the statute that was enacted by the New York legislature? Well, Your Honor, we have chosen to focus the claim on the fact that whatever their authority, it can't be used for an unconstitutional end. I think that possibly one could construct an ultimares argument under state law. We've come to the federal courts to defend the federal constitutional rights of my client. If I may, one last thing on the preliminary injunction, because I know I'm substantially over time. I want to call, and this is on the issue of exceptions and general applicability, and are we making exceptions for secular reasons and refusing them for beliefs held for religious reasons? I would call the court's attention to the Central Rabbinical Congress case, 2014, Second Circuit, page 197. And there the Second Circuit said that when a law burdens free exercise, the burden is on the state to demonstrate that the law is generally applicable, if it wants dismissal. And I would encourage the court to go look at that, because that's what it says in rather plain English in that case of just a few years ago. And I think it's not necessarily intuitive to start with, but that was a dismissal case, and the court says we're not convinced by the state that this is generally applicable, so dismissal reversed. Before you step down, if we ruled for you on First Amendment grounds, as you're asking us to do, what would prevent a racist adoption agency from denying service to black families? Well, let me come at that from two ways, Your Honor. Not a surprising question. First of all, race just has a distinctive place, unfortunately, in our history and fortunately in our constitutional jurisprudence and in the Constitution itself. And if you think about what the Supreme Court said in, let's say, the Bob Jones case about racism or the Pena-Rodriguez case about breaching, breaking into the jury inviolability, and you compare that to what the Supreme Court said about exactly the type of beliefs that my client holds in the Obergefell case itself and in the Masterpiece Cakeshop case, I think you will see that they're conceived of as such very different things that you don't need to worry about the bleed-over. That's something that can be handled if it comes up. And has it ever historically come up? Yes. Has that problem come up in recent decades in the courts? I think the answer is no. If it does, then strict scrutiny is out there, and strict scrutiny is strict, but it's not, contrary to a couple of things that have been said, it's not always fatal. It's still there to protect us. I think we all ask that question of ourselves when we think about a case like this, but it's ironic, because then we have this situation where in the adoption context, because the overriding, in general, in our law, race discrimination is an overriding concern. But when it comes to adoption, the overriding concern is the best interest of the child. And so we see the law and we see the regulations not just permitting, but requiring selection based on race. Again, that takes us back, and I won't repeat, the point that there's exceptions for every type of discrimination. There's exceptions for every type of belief, and secular beliefs about what's in the best interest of the child. No exception allowed for my client's belief based on their faith teachings. Thank you very much. Thank you, Your Honors. Counsel, I have a simple clerical question. We may have your name incorrect on the form that I have. Your surname is E-T-L-I-N-G-E-R? That's correct. Thank you. Good afternoon, Your Honors. Laura Etlinger for Commissioner Poole. I'd like to start with just two points before we get into the actual constitutional claims. And one is that New Hope essentially asks to be let alone to perform its adoption services as it sees fit. But it's only allowed to engage in these adoption services because it's authorized by law to do so and agrees to operate pursuant to strict statutory standards. This is not a case where the state is intruding on private religious practice. This is a robust regulatory scheme that they have chosen to get involved in. If New Hope wanted to make sure that it was only involved in any adoptions that had to do that, where the family was a married heterosexual couple or a truly single parent, it could counsel birth parents that that is what they should choose. And if they were able to locate a specific family that the birth parent wanted to adopt to, they could facilitate a private placement adoption. Help me with understanding the record. You seem to suggest that the agency has insinuated themselves into this regulatory scheme. Were they in existence before the regulatory scheme came into existence? Since they've been in operation, there has been a regulatory scheme for adoption services under New York law. Right. And has that regulatory scheme, is it the same as it is now? It is essentially the same. Did it include this particular issue? No, this regulation was adopted in 2013 after they had already been providing services. And after they had been licensed by the state, is that right? Yeah, they're not exactly licensed, but after their corporate approval had been. But OCFS has ongoing authority to make sure that an agency is operating pursuant to state law. No, I understand. I'm sorry? No, this is a nondiscrimination regulation that's entirely consistent with state law. Well, the state law, when it was enacted, prompted a statement by the governor, and this is in the bill jacket, that it wasn't going to require any policy differences, that the legislation was permissive, not mandatory. And the agency at another time felt that that was not consistent with the law, that the law allows. Which law? It's not consistent with which law? Domestic relations law section 110 was amended to specifically allow unmarried and same-sex couples to adopt. But when he signs that statement that the governor says it's permissive, it would not compel any agency to alter its present policies. Yes, and the — And so to that extent, I mean, if this were ever to go down the road to less restrictive alternatives, why wouldn't this law be satisfied by a requirement that agencies that have religious objections refer to the State? Well, I'd like to address that, because a referral doesn't eliminate the harm that the nondiscrimination regulation seeks to prevent. When New— Let's stay focused. You've just told us that this regulation is entirely consistent with the statute. And my question suggests to you that the regulation goes beyond the statute. Do you not agree with that? The statute doesn't speak to what adoption agencies may or may not do. So in that sense, the regulation regulates something that's outside the scope of the statute. Right. And before we get to that, explain to me what it means to have a permanent or perpetual certificate of incorporation for an adoption agency in New York, which is what I understand New Hope had before this regulation went into effect. Yes. That means that their corporate existence is perpetual, but that is separate from— Or purposes of conducting adoptions. It's their corporate purpose is — their corporate existence is perpetual, but their authority to engage in adoption services is always subject to OCFS's ongoing approval under— What law or statute explains that to them? Under Social Services Law section 34, which says that OCFS can make sure that authorized agencies are performing pursuant to State laws and regulations, and also 371 subdivision 10, which indicates that an authorized agency consents to approval, visitation, inspection, and supervision. And that must necessarily mean ongoing supervision and inspection and approval. And they were, indeed, inspected shortly before you sent — you all sent — when I say you, your clients sent the letter that told them that they were in violation of the regulation in a letter that actually commended them for some of their practices.  Yes. But let me ask you, Social Service Law 385 specifies when the commissioner can order that an agency not place out children anymore. And I don't see any of the reasons for which such an order can be entered to apply in this circumstance. What is your authority to shut them down? Well, 385 is a specific authority under the title having to do with safety of children. Right. We would assume would be the primary concern. That is a primary concern. But in addition to that authority, the State has authority under Social Services Law section 34 and Social Services Law section 371.10, where the agency commits itself to approval, inspection, and supervision. If there were not — and 34 says that the agency has authority to make sure there's compliance with laws and regulations. Right. But why is it that if you find that they're not, why is it that you don't have to go to a court? Because presumably what you're doing is invalidating their Certificate of Incorporation. Well, we're not invalidating their Certificate of Incorporation, which allowed them to do a number of different activities. We're saying that right now they're not in compliance with State law. Why don't you have to go to court? Because this is a — To alter a — to basically narrow a perpetual Certificate of Incorporation. Well, I don't think the action affects their Certificate of Incorporation. It affects their ability to engage in adoption services in the way that they wish to. And this is an administrative process. They would be subject to administrative process. If they didn't like the administrative process, they could go to court in a New York State Article 78 proceeding. Your letter, your client's letter to them gave them two choices, either come in compliance with the regulation or start to close down. Yes. And I am not sure I understand how you can tell an agency that it has to close down without a court order. Well, and I would also point out that they're not raising that claim here, but I understand that Your Honor is interested in it. Well, it goes to the likelihood of success. I mean, all of this comes into whether or not you really are acting pursuant to appropriate authority. Yes. But they're not claiming that we lacked authority to close them down. But the authority is that there's ongoing approval. There is necessarily ongoing approval under 371 Subdivision 10, because there would be no other way we could tell whether they were in compliance with New York law. We have the right to inspect them on an ongoing basis and to supervise them. I must not be making myself clear, even assuming all of that. When you find them deficient in some way, I don't see where the law gives you the authority to order them to close down. I think it's just general principles of New York State administrative law. When they're not in compliance with the law, we're withholding our approval, and they need the approval to operate. They never need approval again once they have perpetual authority. You're right. You get to inspect. You get to do that. But they don't need you to sign off the way they needed you to sign off after their second year of corporation. OCFS disagrees. OCFS takes the position that they do need ongoing approval to conduct adoption services. And what the heck is the point of a perpetual authorization? This is my – I'm perplexed by this. It's just their corporate status, not their ability to engage in the conduct. It's their corporate status that is the legal authority for them to operate an adoption agency. Well, they need both. They need both a corporate authority that gives them the authority to be an authorized agency, and they need OCFS approval, ongoing approval, to make sure that their program is being conducted pursuant to State law. I understand the last supervision report. There is no question that every adoption they have placed has been to parents who were qualified, right? Yes. Okay. So this isn't a case where they are just slipshod about their interviews or not really placing children in appropriate settings. This is a case about whether the pool of applicants they're willing to consider for adoptive parents is what the State requires. And they're saying they can't consider some of those folks without violating their religion. Now, explain to us why we shouldn't view that as an infringement of their religious rights. Their religious rights are not infringed because the Smith test applies here. Contrary to their argument that there is an exception to the Smith test that's simply not what's going on here. These are regulated adoption services. And as regulated adoption services, they're bringing together people outside their organization. Right. But they take no money. They don't have a contract with you. This isn't Fulton. And so their argument is that basically you can't use your licensing authority, your authorization authority to infringe their speech. And Smith does say when you infringe on religious exercise and there's another right at stake, then you may have to satisfy strict scrutiny. But why shouldn't we be receptive to that? Because on the free speech claim, the Supreme Court has long ruled that nondiscrimination rules regulate conduct, not speech. And their conduct is what is being enforced against here. They must serve adoption applicants on a nondiscriminatory basis. When they evaluate applicants, that activity must be done in a nondiscriminatory way. Ultimate thing that you're requiring them to do is be willing to say, after they've done all their evaluation, that an unmarried or a gay couple, it would be in the best interests of a child to be placed with such a family. And they're saying they can never say that. We're requiring them to make a determination that placement with a family, that type of family, may be in the child's best interest. The much more difficult question, and OCFS is very sensitive to this question, is whether, if an agency was willing to conform its conduct to the regulation, if they were willing to bring in applicants of all different sexual orientations, if they were willing to do nondiscriminatory home studies to all of these applicants, if they were willing to place children with any of these applicants, could they still profess their belief with their speech? That's a very different question and a much more sensitive question that OCFS is very sensitive to, and it hasn't been presented with that question. New Hope has never — What's the answer to that question? Well, the — truly, the answer is OCFS has not developed a policy with respect to that because it's never been faced with that situation. But if you look at the regulation, the regulation regulates conduct. So it may well be that they could engage in speech of their choice. This is what the district court found, as long as their conduct conformed to the regulation. But it's hard for me to view this only as conduct when what they are ultimately required to do is make a recommendation. Well — And recommendation seems to me to imply speech. They're not making a recommendation. They're actually making a placement. So they're choosing the placement and placing the child with that family, which is an action. They're not making a recommendation to an outside agency that does the placement. Their ultimate — the ultimate conduct that they were found to be in violation of is that they refused — Don't they have to write a report that basically says it's in the best interests of the child to be placed with this couple? No. They have to — they have to conduct a home study evaluating the family, make a placement, and then after they've made that placement, there are some submissions to the family court. But their — but their conduct — I'm sorry. It's then filed with the family court? There's a report that they file with the family court. But it's their — it's their conduct that's being regulated here. They have never indicated that they would engage in the — conform their conduct to the rule, but want to profess their belief in their counseling sessions. That's a much more difficult question, and one that we don't have the actual answer to because OCFS has never been presented with that. But — Can I take you back to this perpetual existence business? Yes. What agency authorizes perpetual existence? Is that the OCFS? It was a predecessor agency at the time, and these — You said that it was — that that was a reference to corporate existence. Yes. It's filed with the secretary of state. That's where I was heading. That's exactly what it is. It's their corporate existence. So they're a corporation. So what does the OCFS have to do with the functions of the Department of State of New York, which is responsible for corporate existence? When an agency wants to engage in adoption or foster care services, state law requires that the certificate of incorporation also be approved by OCFS. It's an additional requirement. It's an additional requirement. Let me ask you about these regulations. They permit agencies to consider, when making placement decisions, an adoptive parent's age. Is that right? Yes. I'm glad you brought that up because that's a very interesting one, in particular to this case. Because OCFS places exclusively infants, newborns, and toddlers. And age, the statute says that age can be — the age of the child and the age of the prospective adoptive parents can be considered. So one might think that, in this situation, older parents would not very often or perhaps never at all, one might think, be appropriate placements in the best interest of a newborn. Because, obviously, the state would like the parents to be around for at least 18 years or more. But the consideration of age is not an exclusionary factor. There could, in fact, be instances where older parents are just the right placement for a newborn. If you had a newborn with special needs that needed a lot of special care, a retired couple might be exactly the right one. So it doesn't — none of the statutes and regulations that New Hope cites, that they claim permit discrimination, operate as an exclusionary rule. Well, what about race? Race can be considered in a way that if the race of the child — all of these other provisions want consideration — There's no question that they are permitted to consider race, right? Well, it's — the way it's actually worded is that the race or cultural identity of the child, the parent's ability to consider the child's race and cultural identity is appropriate. It's not actually a matching of race. And, again, what you're starting with in those cases is the needs of the child. What does this child need for a placement? We understand that, but you're permitted to consider also the religion of the parents. Isn't that right? Yes. And the religion means the label of the faith. OCFS does not — The label of the faith. The label of the faith, not the particular practices. So that if the — and, again, it's a best interest consideration. It's not a question of a Jewish family coming to the agency and being turned away because they're Jewish. That's never permitted. In fact, that's not permitted by the very same nondiscrimination regulation at issue here. So the consideration of religion in the best placement decision is not a discriminatory rule. But there's no question that you're preventing consideration of whether the adoptive parents are a same-sex couple as a result of the religious views of the agency. Yes, because the State has determined what factors are relevant to the best interest determination. And sexual orientation of the parents, the State has decided, is not a relevant factor to the well-being of the child. You don't think that there's a suggestion here that the regulation is targeting religious groups? No, because the — and this Court has said in the St. Bartholomew's Church case that we cited in our brief, that the fact that there may be a disparate impact on religious organizations because of factual matters, they are the ones more likely to be affected, is not evidence of discrimination. That was where the majority of people affected or the majority of entities affected were, in fact, not religious. The plaintiffs submit that discovery would reveal that the vast majority, if not all, of the agencies that have had to go out of existence since this regulation was promulgated are religious organizations. Do you dispute that? Well, in — it's not in the record. I mean, what discovery? No, but one can compare the — your website's a matter of public record, and one can compare what it — how it existed at the start of 2018 and how it exists now. Well, I can tell you that the — those agencies that went out of existence did not do so because of the enforcement of this regulation. That's not in the record, but my client so advises me. But to the extent there is an impact because religious organizations are the ones that have a view about placement with same-sex couples does not mean that the agency was targeting those. Well, isn't that what discovery might reveal? Because, I mean, the question here is whether there was any problem requiring this regulation with respect to any agencies other than those with religious views. The law had developed to a place where same-sex couples were given equal rights to adopt, and OCFS felt that to be consistent with that statute, it should revise its regulatory language, because there had been regulations on the books that indicated that length of marriage and homosexuality were relevant to a best interest determination. So OCFS revised those regulations and, in doing so, also made it a rule that you can't discriminate on the basis of all of these characteristics—race, religion, sex, sexual orientation, and marital status—in the two adoption applicants. So with respect to religion, you would have us conclude that it's just coincidental that Catholic Charities no longer does adoptions in Boston, Philadelphia, Chicago, Los Angeles, New Orleans, and most of New York. No. It's because those are the organizations that have the belief that is inconsistent with the nondiscrimination rule. And the suggestion that I was making to you is that the plaintiff submits the discovery we would learn that the agencies that were operating in 2018 before the regulation and then had to go out of business after the regulation are faith-based organizations. But even if there's a disparate impact on faith-based organizations, that doesn't mean that the agencies were targeted. I understand that. But then we also get to the question of why your agency, confronted with a law that's permissive, decided to promulgate a regulation that was proscriptive, who they were aiming it at. I mean, what problem there was that you felt needed to be addressed? Now, it may be that discovery would reveal no religious animus, but I thought in your briefs you conceded that the statements being made, at least that are in the record so far, are ambiguous. Well, two things. Discovery is not needed because the purpose of the regulation was made clear by the regulatory history. And we've cited all of this in our brief. There were — I thought you were acknowledging that it was ambiguous. Well, the — I'm talking about separately, first, the history of the regulation. The history of the regulation shows that there were informational letters sent to the agencies explaining that we were bringing — OCFS was bringing the function of the regulations into compliance with changes in the law. And again, I mean, the problem is you went beyond the law. And the statement — So to the extent you write to the agencies, we're only bringing the regulation up to date with the applicable law, there's at least an argument for the plaintiffs to make that you went beyond that and that your purpose was — indicates some religious hostility. These statements that they rely on, two of the statements are somewhat similar to two of the statements in Masterpiece Cake Shop. This is what we explain in our brief. And those statements, the Court in Masterpiece Cake Shop found were ambiguous and could — could either be seen as simply a statement of nondiscrimination requirement or perhaps as dismissive of a religious confrontation. But the Masterpiece Cake Shop Court was not concerned about those statements in the absence of the clearly hostile statements that followed. Sotomayor, I understand that. But you're not focusing on what I asked you about, which is that your regulation goes beyond the law in a way that raises concern, because the — when the law was enacted, the governor said it wasn't going to require anybody to change their policies. Everybody knew what he was talking about. You went beyond and required them to change their policies. And they say they're entitled to discovery as to why you did that and the reason they say there's a good faith basis to think it was discriminatory or your ambiguous statements and the ultimate consequences, which is to effectively drive religious adoption agencies out of the New York market, they claim. We think the history of the regulation as set forth in our brief, including all of the informational letters that were issued one after the other in response to the changes in the law, explain where the agency was going and why it was going there. It felt that this was consistent, even if it went beyond, that it was consistent with the law and with New York State law that prevents discrimination on the basis of sexual orientation as a matter of civil rights under the civil rights law and in public accommodations under the executive law. So they felt that this was entirely consistent with all of New York State law. The history of the regulation sets that forth that we don't think discovery would produce anything beyond that. And the statements speak for themselves. And the two statements that could be taken one way or the other were not found to be enough in Masterpiece Cake Shop. There are no other statements here. There are no statements that raise hostility toward religion. Let me ask you about that. Your client agency referred to New Hope's practices as, quote, archaic, unquote. Well, the agency referred to the prior regulations, which permitted less. I have a relatively simple question. Is it not correct that OCFS referred to New Hope's practices as archaic? That is incorrect. It never did that. No. It referred to its prior regulations as archaic. I see. And did OCFS ask New Hope to, quote, compromise its beliefs? No. OCFS pointed out that other agencies who had told the agency that they did have a problem with their beliefs and these placements had decided themselves to compromise. Yes. But that means that were you not saying explicitly or implicitly that New Hope had to compromise its beliefs? I think what we were saying was they had the choice to do so if they chose. With the alternative being to shut down. With the alternative to be shut down because they were not in compliance with New York law. I understand that on a motion to dismiss, we have all these pleadings and the like most favorable to the plaintiff. The — in doing that, we would have to conclude that they were being told to either compromise or shut down. But even the Supreme Court found that those statements were not enough to suggest hostility. It was only because the Commissioner went on to say that the plaintiff's beliefs in Masterpiece Cake Shop were a despicable piece of rhetoric. That was the evidence that the Court was concerned about, not these somewhat ambiguous statements. I think they tried to draw an analogy to that, to the statement that there is no place in New York for any agency that I'm not — I don't have the quote in front of me, that basically does not view homosexual and unmarried couples as fit parents for adoption. And so they're suggesting that less colorfully, perhaps, you have expressed the same hostility. In any event, at the dismissal stage, why isn't that enough? Well, first of all, the statement was there's no place in New York for providers that choose not to follow the law. So it wasn't a specific statement about their beliefs. But this regulation was what they were talking about. Yes, this regulation. This regulation. Because in — because those statements are not enough to raise an inference about hostility. At most, they show there could be some ambiguity. But there is no evidence of hostility in those statements. Well, what's ambiguous is whether he had anything in mind other than faith-based agencies whose religious beliefs do not permit them to agree to these two provisions. The regulation prohibits discrimination on a wide variety of— Right. But there was no reason to think that that was the concern he was addressing when he spoke, right? I mean, what was the context of the remark? No. The context of the remark was agencies that refused to place with same-sex or unmarried couples. Right. So that was what there was no place for. Because the law didn't allow for it. Well, now the question is whether the law is — violates the Constitution. Right. But the question now is whether that reflects a hostility to a religious view contrary to what was put into the regulation. Isn't that where we're at? Yes. And we don't believe that that expresses a hostile view, and we don't believe discovery will produce any evidence of anything else, because the history of the regulation is very clear that it was enacted in response to the changes in the law. You think those comments can be construed as neutral? Yes, absolutely. Because they are just saying that we feel strongly about this nondiscrimination rule, and the law has changed, and this is the rule that's consistent with the law  Thank you very much, Ms. Ettinger. Thank you. I've given you as much time as your adversary, but he's reserved a couple of minutes. The Court has been generous, and I'll be short. Counsel claimed that the regulation regulates conduct, not speech, and their briefing they really focused on an incidental-to-conduct argument citing fair. And I would just really like to contrast what was going on in the fair case. In fair, the conduct at issue was requiring the law school to hand a key to an empty classroom to a JAG recruiter. And the incidental speech at issue was requiring the law school to let the students know what classroom that was. That's the conduct. That's the speech. The situation here could not be more different. OCFS wants to force new hope into the conference room with the birth mothers, with the adoptive parents, and control what it says. It's much more analogous to if Donald Rumsfeld was trying to require the law school dean to stand up in front of the student body and advocate a JAG core career as a great choice for Yale graduates. That would have been a different case. And I think, in fact, when you parse the fair case, you don't have to parse it too closely, it says exactly that that would be prohibited and that it held the way it did in that case because it's fundamentally a fight about an empty conference room. What do you think are your legal obligations, though, given that you have an authorization pursuant to the laws of New York? I mean, I don't understand you to be arguing that you're not obligated to follow every other rule and regulation that they've promulgated and that you, in fact, do. So, I mean, obviously you think you're bound to comply with rules and regulations of New York. Your Honor, I think that when we have a lot of law that governs what happens when free speech, and I frankly think that's simpler in this case, and free exercise run up against neutral regulation. And that law, I think once you've determined, as we think we will determine, that this law was not neutrally motivated and certainly not neutrally enforced, and we saw that before our very eyes in the attempt to shut down New Hope in the midst of the appeal, if you get past that, well, then that clash is controlled by strict scrutiny and we have precedent that guides us through that. And may heartfelt religious beliefs sometimes have to give way to state necessity? Yes, applying the compelling state interest test of strict scrutiny. So it's hard. There's no general answer. Strict scrutiny is a very fact-specific inquiry. But how you resolve those issues, I think, is well established. And, Your Honors, I will stop. Thank you. Thank you, both of you for excellent arguments. We're grateful to you both. Thank you. We reserve the decision and we're adjourned.